Argued and submitted July 18, 2013, affirmed May 7, 2014

In the Matter of the Compensation of
Francisco M. Carlos-Macias, Claimant.

SAIF CORPORATION
and Sherman Paint & Collision,
*Petitioners,*

*v.*

Francisco M. CARLOS-MACIAS,
*Respondent.*

Workers' Compensation Board
1004446, 1004555; A150950

325 P3d 827

Julie Masters argued the cause and filed the briefs for petitioners.

Dale C. Johnson argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

Employer Sherman Paint & Collision, and its workers' compensation insurer SAIF Corporation (collectively, petitioners) seek judicial review of an order of the Workers' Compensation Board (board), which determined that there was a causal relationship between requested diagnostic medical services and claimant's accepted conditions sufficient to support the compensability of those diagnostic services under ORS 656.245(1)(a). Petitioners assert that the board erred when it upheld the denial of claimant's current condition while simultaneously finding a sufficient causal relationship between the proposed diagnostic medical services and his previously accepted conditions to support the compensability of those services. Petitioners argue that the diagnostic services were not related to claimant's "accepted condition" but were instead designed solely to rule out unrelated noncompensable conditions. Finally, petitioners argue that the board's decision is not supported by substantial evidence or substantial reason. For the reasons that follow, we affirm.

The underlying claim dates from a work-related injury sustained when claimant damaged his left shoulder while lifting and dragging a heavy forklift component in November 2007. We begin by recounting the procedural history of this case before turning to the underlying medical history.

After SAIF issued an acceptance for a "left shoulder strain," claimant made a demand for acceptance of additional conditions, namely, shoulder sprain, acromioclavicular (AC) joint sprain, hypertrophic rotator cuff tendinosis, and AC joint impingement. In a modified notice of acceptance, SAIF took responsibility for the AC sprain in addition to the previously accepted left-shoulder strain and also eventually accepted the left-shoulder rotator cuff tendinosis.

SAIF issued a notice of closure in September 2009 that denied an award of permanent partial disability. The Workers' Compensation Division of the Department of Consumer and Business Services (the division) reviewed that closure and concluded that claimant was medically stationary with regard to the "accepted condition(s)" and

allowed claim closure. The reviewer made a significant change to the notice of closure as it related to permanent partial disability by attributing 75 percent of claimant's loss of range of motion and 50 percent of the loss of repetitious use of the shoulder to the "accepted condition(s)." The order on reconsideration awarded claimant a total of eight percent permanent partial disability to his left shoulder.

Turning now to the medical history, claimant sought initial medical treatment with Dr. Ackerman, who diagnosed a left-shoulder strain. By January 2008, Ackerman had expanded his diagnosis to include a left-shoulder strain and an AC strain. Claimant continued to work buffing cars and his pain began to radiate into the left upper arm. An MRI ordered by Ackerman identified swelling in the AC joint and evidence of rotator cuff tendinosis. Claimant saw an orthopedic surgeon, Dr. Straub, who diagnosed shoulder strain.

Following a July 2008 medical examination, Dr. Leadbetter opined that claimant suffered from a left-shoulder strain and sprain and hypertrophic rotator cuff tendinosis. Leadbetter declared claimant medically stationary without impairment. Ackerman issued a check-the-block concurrence letter.

Straub performed left-shoulder surgery in December 2008. His post-operative diagnosis included left-shoulder impingement, degenerative changes in the AC joint, and a superior labral tear from anterior to posterior (SLAP tear). Straub did not know why claimant's left shoulder continued to be painful. A subsequent examination by Ackerman revealed some swelling around claimant's left hand and arm. Concerned that there might be a vascular compromise secondary to the surgery, Ackerman referred claimant to an orthopedist.

The orthopedist, Dr. Fletcher, diagnosed AC joint pain and subacromial bursitis recalcitrant to treatment. He thought that the post-surgery symptoms arose largely because "the AC joint appears to not have been completely resected." Fletcher discounted the possibility of vascular impairment; he thought that most of claimant's pain centered

on the AC joint. He recommended diagnostic and possible therapeutic injections of lidocaine and a corticosteroid.

At claimant's next examination with Ackerman, the physician diagnosed left-arm swelling and pain of unknown origin. A contemporaneous examination by Dr. Hurtado, claimant's primary care physician, diagnosed "edema" in the left arm; Hurtado suspected injury to the lymphatic vessels and recommended a vascular evaluation.

SAIF referred claimant to a medical examination with Dr. Matteri, who opined that claimant's symptoms were embellished and nonorganic. He stated that the accepted conditions were medically stationary and that none of those conditions contributed to any of claimant's permanent disability.

After a vascular specialist ruled out any vascular disorder associated with the injury, claimant was referred to Dr. Lin, who recommended the diagnostic tests that are here in dispute. Specifically, Lin ordered "EMG/nerve conduction studies" (EMG test) to rule out a neurological component of claimant's symptoms; he also recommended a triple-phase bone scan to rule out "complex regional pain syndrome type 1 versus reflex sympathetic dystrophy."

After reviewing the EMG-test and triple-phase-bone-scan requests, Oregon Health Services (OHS), the managed care organization assigned to the claim, denied them. Claimant appealed to the medical director of the division. In response to a request from SAIF, Lin identified the requested procedures as "palliative";[1] in a different letter, he indicated that the requested tests were aimed at determining the "extent" of claimant's injury. In a clinical note, Lin explained the need for the tests as follows:

> "The triple-phase bone scan is needed to try to corroborate whether this patient has CRPS type 1/RSD. Although the patient's pain behaviors make clinical interpretation

---

[1] The letter defined palliative care in language that mirrored, in part, the definition currently used in OAR 436-010-0290, which provides:

"Palliative care means medical services rendered to reduce or moderate temporarily the intensity of an otherwise stable medical condition, but does not include those medical services rendered to diagnose, heal, or permanently alleviate or eliminate a medical condition."

very difficult, as a result we have to rely on objective data. If the triple-phase bone scan is positive, it implies the diagnosis. If it is negative, it does not completely rule it out, but in this patient it would in my mind given his behaviors. * * * The same is true of the electrodiagnostic studies."

SAIF sent the case back to Matteri for a "records review." He concluded that none of the requested tests was required medical "treatment for any accepted conditions resulting from his November 13, 2007 work incident."

SAIF issued a current-condition denial; that denial listed the accepted conditions and explained that those conditions were "no longer a material contributing cause of [claimant's] left[-]shoulder complaints and [the] need for treatment." The denial also provided that claimant could continue to receive benefits for his "accepted conditions."

SAIF and claimant solicited opinion letters from the doctors involved. Matteri issued a check-the-block opinion that the "triple phase bone scan" was not necessary to determine the "extent of the accepted conditions." (Formatting omitted.) Matteri added that claimant did not suffer from "CRPS or RSD." Straub issued a similar check-the-block letter, and Ackerman followed suit. Lin also issued a check-the-block letter; he stated that the requested diagnostic testing was "reasonable and necessary" to determine the extent of claimant's "accepted injury." Earlier, however, Lin had opined in a chart note that, given claimant's history of pain and lack of objective findings, although he could not rule out CRPS, with respect to claimant's "shoulder per se," "the pathology there is over, done, healed, and treated to the best of medical science's abilities."

Claimant requested a hearing. After hearing the case, the ALJ issued an opinion and order that upheld SAIF's denial of both claimant's current condition and the compensability of the proposed diagnostic exams. With respect to the current-condition issue, the ALJ found that Matteri's, Straub's, and Ackerman's opinions were persuasive, but found that Lin's reports contradicted themselves and were conclusory. With respect to the disputed diagnostic tests, the ALJ found that the proposed tests "are not causally related to claimant's accepted conditions."

Claimant appealed that order to the board. With respect to the denial of claimant's current condition, the board expressed its approval of the ALJ's reasoning and upheld that denial. However, the board reversed the ALJ with respect to the compensability of the diagnostic tests. In support of that latter conclusion, the board cited the opinion of Lin, claimant's attending physician, stating that Lin's opinion established both that the accepted conditions were a material contributing cause of the proposed diagnostic testing and also that the requested testing was "necessary to determine the extent of claimant's compensable left shoulder injury; *i.e.*, his accepted left shoulder conditions." (Footnote omitted.) The board acknowledged that Lin's opinion was contradictory concerning the causal relationship between the accepted conditions and the current left-shoulder conditions, but noted that "[t]he issue of whether the proposed diagnostic procedures are necessary to determine the extent of the compensable injury is different from the issue of whether the current left shoulder condition is compensable."

SAIF moved for reconsideration of that order on the ground that the order was contradictory insofar as it upheld the denial of the current condition but reversed the denial of the proposed diagnostic tests. In an order on that motion, the board adhered to its previous decision, and distinguished the intervening decision of this court in *SAIF v. Swartz*, 247 Or App 515, 270 P3d 335 (2011). This timely petition for judicial review followed.

Petitioners first argue that the board erred in upholding a denial of claimant's current condition while at the same time finding a causal relationship between the requested diagnostic medical services and the work injury that was sufficient to support the compensability of those diagnostic services. Petitioners also argue that the board failed to adequately explain the reasons for its decision. We address each of those arguments in turn.

The thrust of petitioners' argument in this case is that, because the board upheld the current-condition denial, the issue of compensability of diagnostic procedures ought to be foreclosed because there is no "accepted" condition upon which those procedures can be based. According to

petitioners' logic, if the board ruled that the medical condition was properly denied, then current or future diagnostic medical procedure for unidentified conditions must be denied as well. That logic overlooks several critical and undisputed facts in this case. Notably, claimant suffered a compensable injury; SAIF accepted that disabling injury; the injury produced a definable set of ongoing and chronic symptoms that continue to wax and wane; and claimant was awarded permanent partial disability because of that compensable condition.

We have repeatedly held that diagnostic services related to discovery of the cause of complaints of pain can be reasonable and necessary expenses borne by the workers' compensation carrier even if the results of the testing reveal that the condition was unrelated to the compensable condition. *Counts v. International Paper Co.*, 146 Or App 768, 934 P2d 526 (1997); *Faught v. SAIF*, 70 Or App 388, 689 P2d 1038 (1984); *Brooks v. D & R Timber*, 55 Or App 688, 639 P2d 700 (1982). The cases cover a litany of situations. In *Counts*, we affirmed the denial of payment for tests concerning coronary artery disease and myocardial infarction in a case of chest-wall contusion, but reiterated that the statutory scheme allows payment for diagnostic examinations that are reasonable and necessary to ferret out work-related injuries and disease. 146 Or App at 770-71. In *Faught*, we outlined the need for the carrier to pay for psychiatric evaluations on a claim involving a low back injury. 70 Or App at 391-92. In *Brooks*, we explained the need for the carrier to pay for an arthroscopy unrelated to the compensable knee injury. 55 Or App at 692-93.

In the face of petitioners' argument "that the record does not establish that the proposed medical treatment was necessitated in material part by the accepted conditions," the board cited ORS 656.245, which provides, in part:

"(1)(a) For every compensable injury, the insurer or the self-insured employer shall cause to be provided medical services for conditions caused in material part by the injury for such period as the nature of the injury or the process of the recovery requires, subject to the limitations in ORS 656.225, including such medical services as may be required after a determination of permanent disability.

In addition, for consequential and combined conditions described in ORS 656.005(7), the insurer or the self-insured employer shall cause to be provided only those medical services directed to medical conditions caused in major part by the injury."

In this case, the board reasoned that, if the proposed diagnostic tests were necessary to determine the cause or extent of disability, then those services were compensable whether or not the condition revealed by the tests was compensable. In so reasoning, the board correctly pointed out that the "issue of whether the proposed diagnostic procedures are necessary to determine the extent of the compensable injury is different from the issue of whether the current left shoulder condition is compensable."

The board also acknowledged the contrary evidence presented in the reports of Matteri, Straub, and Ackerman. Nevertheless, on the issue of compensability of the diagnostic tests, the board gave greater weight to the opinion of the attending physician, Lin, in accordance with *Weiland v. SAIF*, 64 Or App 810, 814, 669 P2d 1163 (1983). Absent any persuasive reason to disregard the opinion of Lin, we see no reason to disturb that finding.

Although we have addressed the issue of diagnostic examinations on several occasions, petitioners have added a new twist by contending that the need for the requested diagnostic examinations does not derive from the "accepted conditions." Petitioners point to *Swartz*, 247 Or App at 525, which they urge us to read as establishing the proposition that whether treatment is compensable is determined by reference to the "accepted conditions." As we recently explained in *Brown v. SAIF*, 262 Or App 640, 325 P3d 834 (2014), however, the terms "compensable injury" and "accepted condition" are not interchangeable. It is the former term that the legislature used in ORS 656.245(1)(a) to define what medical services are compensable by the insurer. As it relates to payment for diagnostic procedures for conditions not yet discovered, the distinction between a compensable injury and an accepted condition can have no greater significance. As we explained in *Brown*, that is not the scheme created by the legislature. 262 Or App at 648-56.

Petitioners next argue that the board failed to adequately explain why it relied on Lin's medical opinion to support the compensability of the requested diagnostic exams, while discounting Lin's opinion in the context of denying the current condition. Petitioners again rely on *Swartz*, here, for the proposition that it was logically inconsistent to simultaneously affirm the current-condition denial and reverse the denial of medical services. In this case, however, the board's reasoning distinguishes claimant's situation from the situation in *Swartz* by pointing out the necessity of determining the extent of claimant's disability. In this case, the board wrote:

"Here, Dr. Lin, claimant's attending physician, opined that the recommended diagnostic testing was reasonable and necessary to determine the extent of the accepted injury. Claimant's * * * letter to Dr. Lin listed the accepted conditions due to the accepted injury claim. Dr. Lin stated that the testing was particularly important when, as in this case, the patient presented in an exaggerated manner that may actually be a culturally related presentation. In addition, the recommended tests were important to determine diagnosis and treatment.

"We equate Dr. Lin's reference to 'accepted injury' with 'accepted conditions.' Accordingly, we conclude that Dr. Lin's opinion supports a conclusion that the accepted conditions were at least a material contributing cause of the proposed diagnostic testing. Moreover, Dr. Lin's opinion establishes that the requested testing was also necessary to determine the extent of claimant's compensable left shoulder injury; *i.e.*, his accepted left shoulder conditions."

Although the board concluded that Lin's opinions were contradictory concerning the relationship between the "accepted conditions" and the "current left shoulder condition," the compensability of the current condition and the extent of disability for the accepted condition are distinct issues. *See Schleiss v. SAIF*, 354 Or 637, 646-48, 317 P3d 244 (2013). Although the board unnecessarily conflated the accepted conditions with the compensable injury, the board fully articulated and accurately outlined the distinction between the evidence as it related to the request for diagnostic services and as it related to the denial of the current condition;

in that respect, the board's order was cogent. Although the evidence that the board used to support its decision on the question of diagnostic services cut both ways, the board explained the differing medical opinions, the different legal standards involved, and listed the reasons for its reliance on the medical evidence that supported its decision.

Affirmed.